Kathryn A. Stebner, State Bar No. 121088
George Kawamoto, State Bar No. 280358
**STEBNER AND ASSOCIATES**
870 Market Street, Suite 1212
San Francisco, CA 94102
Tel: (415) 362-9800
Fax: (415) 362-9801

Christopher J. Healey, State Bar No. 105798
**DENTONS US LLP**
4655 Executive Drive, Suite 700
San Diego, CA 92121
Tel: (619) 236-1414
Fax: (619) 232-8311

Robert S. Arns, State Bar No. 65071
Julie C. Erickson, State Bar 293111
**THE ARNS LAW FIRM**
515 Folsom Street, 3rd Floor
San Francisco, CA 94105
Tel: (415) 495-7800
Fax: (415) 495-7888

[Additional Counsel listed on signature page]

Attorneys for Plaintiffs and the Proposed Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Audrey Heredia as successor-in-interest to the Estate of Carlos Heredia; Amy Fearn as successor-in-interest to the Estate of Edith Zack; and Helen Ganz, by and through her Guardian ad Litem, Elise Ganz; on their own behalves and on behalf of others similarly situated,<br><br>               Plaintiffs,<br><br>vs.<br><br>Sunrise Senior Living, LLC; and Does 1 Through 100,<br><br>               Defendants. | CASE NO. 4:18-CV-00616-HSG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**<br><br>1. VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT (Civ. Code § 1750 *et seq.*)<br>2. UNLAWFUL, UNFAIR AND FRAUDULENT BUSINESS PRACTICES (B&P Code § 17200 *et seq.*)<br>3. ELDER FINANCIAL ABUSE (W&I Code § 15610.30)<br><br>**JURY TRIAL DEMANDED** |

1

**INTRODUCTION**

2    1.    Plaintiff Audrey Heredia as successor-in-interest to the Estate of Carlos Heredia,

3    Plaintiff Amy Fearn as successor-in-interest to the Estate of Edith Zack, and Plaintiff Helen Ganz

4    by and through her Guardian ad Litem Elise Ganz (collectively "Plaintiffs") bring this action for

5    injunctive relief and damages to stop the unlawful and fraudulent practices of Sunrise Senior

6    Living, LLC ("Sunrise" or "Defendant").

7    2.    Defendant has engaged in a scheme to defraud seniors, persons with disabilities,

8    and their family members at its assisted living facilities in California by falsely representing to all

9    residents in its admission contracts that each resident will be provided the care services (through

10    facility staff) that the resident needs as determined by a resident assessment conducted by facility

11    personnel.  This is false and misleading because as Sunrise has a corporate policy and practice of

12    failing to provide sufficient numbers of properly trained staff to meet the aggregate assessed needs

13    of all facility residents, as determined by Sunrise's own resident evaluation and service level

14    system.  As a result of Sunrise's staffing policies and procedures, residents do not receive the

15    services they need and pay Sunrise to provide, or are placed at substantial risk that they will not

16    receive such services.  Sunrise is aware of the consequences its staffing policies and practices have

17    on its residents, but it has not disclosed them to current or prospective residents or their family

18    members.

19    3.    In its form admission agreements, Sunrise uniformly represents to each new

20    resident that (a) each resident will receive the care that he/she requires; (b) the facility's

21    professional staff will determine the care required for each resident through the resident

22    assessment process; and (c) the amount of care identified in the resident assessment process as

23    needed by the resident will be translated into a "score" and specific "Service Level" for which the

24    resident will be charged on a daily basis.  The reasonable consumer understands these

25    representations to mean that, as a matter of policy and practice, Sunrise will provide sufficient

26    staff at each facility to deliver to all facility residents the amount and type of care that Sunrise has

27    identified as necessary based on resident assessments and overall census.

28    4.    Sunrise's misrepresentations, misleading statements, and failures to disclose about

the manner in which its facilities are staffed are material to the reasonable consumer.  Seniors and/or their family members choose an *assisted* living facility based on the expectation that they will receive the quantity and quality of care that they need.  Sunrise's corporate policies and practices result in facility staffing levels that are much lower than necessary to meet the needs identified in residents' assessments, such that residents either do not receive promised care and/or face a substantial risk that such care will not be provided in the future.  It is therefore a matter of fundamental importance to the reasonable consumer that Sunrise does not have the systems in place to ensure that sufficient numbers of trained staff are available to provide the levels of care that Sunrise has determined are necessary, promised to provide, and for which it is charging its residents.

5.      Through its representations and nondisclosures, Sunrise dupes residents and family members into paying large sums in the form of new resident fees and initial monthly payments. For example, Carlos Heredia was charged a new resident fee (labeled by Sunrise as a "Move-In Fee") of $4,050 prior to his entry to the Sunrise at Tustin facility.

6.      Sunrise's staffing policies and practices that fail to ensure adequate staffing levels place all residents at an unnecessary risk of harm.  That risk is particularly acute, given the vulnerable nature of the targeted population of seniors and residents with disabilities.

7.      Sunrise's promotion of its system of comprehensive resident assessments and corresponding Service Levels in its form contract and marketing materials contributes to its competitiveness in the marketplace of assisted living facilities and is a factor in its pricing structure.  Its purported use of such a system to accurately assess the needs of residents and provide sufficient staffing to meet those needs enables it to charge more for residency and services at its facilities than it otherwise could.  In effect, residents pay a premium for a system that Sunrise misrepresents will result in comprehensive resident needs assessments and the staff necessary to provide the promised care.

8.      If Plaintiffs and the putative class members had known that Sunrise has not implemented the systems necessary to ensure that sufficient numbers of trained staff are available to meet residents' assessed needs, they would not have agreed to enter Sunrise or paid Sunrise

significant amounts of money in new resident fees and monthly charges.

9.      This action seeks to require Sunrise to cease and desist its ongoing violations of law.  In addition, Plaintiffs seek an order requiring Sunrise to disclose to prospective and current residents, their family members, and/or responsible parties that its facilities are not staffed to meet the assessed needs of residents.  Plaintiffs further seek an order prohibiting Sunrise from charging fees based on resident assessments, when Sunrise does not, as a matter of corporate policy and practice, staff its facilities to meet the assessed needs of its residents.  In addition to injunctive relief, this action seeks class wide damages based on Defendant's misrepresentations and misleading statements and failures to disclose alleged herein.  This action does not seek recovery for personal injuries, emotional distress, or bodily harm that may have been caused by Defendant's conduct alleged herein.

## PARTIES

### Plaintiffs

10.      Plaintiff Audrey Heredia is the wife of decedent Carlos Heredia, a resident of Sunrise at Tustin, in Santa Ana, California from June 2014 to April 2015.  She is the successor-in-interest to the Estate of Carlos Heredia pursuant to California Code of Civil Procedure sections 77.11 and 377.32.  At all times relevant to this complaint, Carlos Heredia was an elder as defined under California Welfare & Institutions Code section 15610.27 and a senior citizen as defined under California Civil Code section 1761(f).  Carlos Heredia was at all times herein mentioned a resident of the State of California.  Plaintiff Audrey Heredia brings this action on behalf of decedent Carlos Heredia and all others similarly situated.

11.      Plaintiff Amy Fearn is a daughter of decedent Edith Zack, a resident of Sunrise of San Mateo, in San Mateo, California from September 2016 to November 2016.  She is a successor-in-interest to the Estate of Edith Zack pursuant to California Code of Civil Procedure sections 377.11 and 377.32.  At all times relevant to this complaint, Edith Zack was an elder as defined under California Welfare & Institutions Code section 15610.27 and a senior citizen as defined under California Civil Code section 1761(f).  Edith Zack was at all times herein mentioned a resident of the State of California.  Plaintiff Amy Fearn brings this action on behalf of

1    decedent Edith Zack and all others similarly situated.

2         12.    Plaintiff Helen Ganz is a current resident of Sunrise of San Rafael, in San Rafael,

3    California who moved into the facility on September 30, 2016.  At all times relevant to this

4    complaint, Ms. Ganz is and was an elder as defined under Cal. Welf. & Inst. Code § 15610.27 and

5    a senior citizen as defined under Cal. Civ. Code § 1761(f).  Elise Ganz is her daughter.

6    Simultaneous with the filing of this amended complaint, Elise Ganz has filed a motion for

7    appointment as her mother's guardian ad litem for the purpose of prosecuting this action.  Helen

8    Ganz is and was at all times herein mentioned a resident of the State of California.  She brings this

9    action on behalf of herself and all others similarly situated.

10        **Defendant**

11        13.    Defendant Sunrise Senior Living LLC is a Delaware limited liability company with

12   its principal place of business in McClean, Virginia. The residences of its members are unknown.

13        14.    Sunrise owns and operates all of the real estate and buildings, and holds the

14   licenses for approximately 52 assisted living facilities in California under the Sunrise name.

15        15.    The true names and capacities, whether individual, corporate, associate, or

16   otherwise, of the designated herein as Does 1 through 100, inclusive, are presently unknown to

17   Plaintiff and thus sued by such fictitious names.  On information and belief, each of the

18   Defendants designated herein as "Doe" is legally responsible for the events and actions alleged

19   herein, and proximately caused or contributed to the injuries and damages as hereinafter described.

20   Plaintiffs will seek leave to amend this Complaint, in order to show the true names and capacities

21   of such parties, when the same has been ascertained.

22        **JURISDICTION AND VENUE**

23        16.    This lawsuit was initially filed in the California Superior Court (Alameda County)

24   and was removed by Defendant Sunrise on January 30, 2018.  This Court has jurisdiction under

25   the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).   Plaintiffs and Defendant are residents and

26   citizens of different states.  The class size is greater than 100.  According to Defendant's removal

27   papers, its records indicate that approximately 12,740 individuals lived in Sunrise facilities in

28   California from the start of the Class Period through the date of removal.  The aggregate amount

1   in controversy, based on damages in the form of monthly charges averaging an estimated $4,000

2   to $10,000 per class member over a period of four years is greatly in excess of $5,000,000.

3          17.     This Court has jurisdiction over all of the claims alleged herein.  Defendant is

4   subject to the personal jurisdiction of this Court because it has sufficient minimum contacts in

5   California, or otherwise intentionally avails itself of the California market through ownership and

6   management of approximately 52 assisted living facilities located in California, derivation of

7   substantial revenues from California, and other activities, so as to render the exercise of

8   jurisdiction over Sunrise by the California courts consistent with traditional notions of fair play

9   and substantial justice.

10         18.     Venue is proper in this District under 28 U.S.C. § 1391(a), based on the following

11  facts: Defendant conducts substantial business in this District, including but not limited to the

12  ownership, operation and management of assisted living facilities in the counties of Alameda,

13  Marin, San Francisco, Santa Clara. San Mateo, Contra Costa, Monterey, and Sonoma; a portion of

14  Defendant's liability arose in this District; and the acts upon which this action is based occurred in

15  part in this District.

16                 **GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

17         19.     Sunrise provides assisted living and memory care for senior citizens and persons

18  with disabilities at facilities nationwide, including 52 facilities that it owns and/or operates in

19  California.

20         20.     Assisted living facilities, also called Residential Care Facilities for the Elderly

21  ("RCFEs"), offer room, board, and daily assistance for seniors in certain activities of daily living

22  ("ADLs"), such as preparing meals, shopping, transportation, preparing and taking medication,

23  using the telephone, paying bills, housekeeping, and others.

24         21.     Assisted living facilities are intended to provide a level of care appropriate for

25  those who are unable to live by themselves, but who do not have medical conditions requiring

26  more extensive nursing care and significant assistance with most of their ADLs.  Sunrise's assisted

27  living facilities also have Memory Care units, which serve individuals with dementia and other

28  cognitive disorders.

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

22.    In recent years, Sunrise has increasingly been accepting and retaining more residents with conditions and care needs that were once handled almost exclusively in skilled nursing facilities.  Sunrise has acknowledged in public statements:

> What we've seen over the years is that, we've gone from caring for a more independent senior who may have needed some assistance with activities of daily living (ADLs), to those who have more complex health needs requiring coordination of care and services.

> Industry-wide, we are taking care of folks who are frailer, needing more assistance with ADLs and chronic disease management, such as diabetes. Also, people are living longer. As the average lifespan has increased, so has the average age of Sunrise residents.

https://www.sunriseseniorliving.com/blog/december-2016/the-evolution-of-care-in-assisted-living.aspx (last visited February 22, 2018).  Sunrise's practice of accepting and retaining residents with "more complex health needs" has allowed it to increase not only the potential resident pool but also the amounts of money charged to residents and/or their family members.

23.    At Sunrise facilities, residents are charged a base rate, which includes room, board, and basic maintenance, cleaning and laundry.  Sunrise assesses each resident before admission and then periodically, including whenever there is a change of the resident's condition.  By performing these assessments, Sunrise determines what additional services a resident needs, such as assistance with ADLs.  Each additional need correlates to a numerical score and "Service Level," which determines how much more time Sunrise staff must spend caring for the resident.  The Service Level also determines the amount charged per-day for fees.  Thus, the higher the Service Level assessed the more money Defendant charges the resident.

**Uniform Representations in Sunrise's Standardized Contracts and Other Corporate Materials**

24.    Defendant represents that it will use its resident assessment system to identify the level of care necessary to ensure that residents receive the services they require and to identify the amount Sunrise will charge them for services.

25.    Sunrise clearly represents in its standardized contracts that there is a connection between the services they will receive and the level of care assessed as needed in the resident assessment system.  At or before the time of move-in, Sunrise requires all residents to sign a

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

1    "Residency Agreement."  Section I.D. of the Residency Agreement describes the Assessment

2    process:

> The level of assisted living services required by the Resident is determined through
> an assessment ("Assessment") of the Resident.  The Assessment is performed by
> designated team members and includes an evaluation of each Resident's specific
> needs.  It covers areas such as: mobility, skin care, eating habits, oral hygiene,
> continence, cognitive behavior, and medication.  This Assessment, along with the
> Physician's Report, provides the basis for identifying the Resident's Service Level.

7    26.    Section I.E. describes the "Resident Service Plan" that is developed based

8    on the Assessment.  It provides, "The service plan will outline the services the Resident is

9    to receive."

10    27.    Section I.F. provides:

> If the Resident's condition changes so that the previously assessed level of services
> is no longer appropriate, the Community will reevaluate the Resident's needs to
> determine which level of service is appropriate and notify the Resident/Responsible
> Party of such reevaluation.  The rate charged will vary according to the level of
> service provided.

14    28.    Section III.F. emphasizes that residents who require more services will be charged

15    higher fees.  "A change in the level of service is <u>not</u> considered a change of fees or charges.

16    Rather, it is an increase in services which are subject to the higher fees corresponding to those

17    services**.**"

18    29.    The Residency Agreement includes a "Schedule of Community Fees."  It lists

19    "Service Level Fees" including "Assisted Living Select," "Assisted Living Plus," "Assisted Living

20    Plus Plus," "Reminiscence Program Fee," "Reminiscence Plus Plus," etc., with corresponding

21    daily rates ranging from $18 to $98.  The same page indicates that residents' assessments result in

22    a numerical value:  "Enhanced Care fees are variable, **depending on the needs of the resident as**

23    **determined by the resident's assessment <u>score</u>**."  (emphasis added).

24    30.    In the Agreement, Sunrise describes the various service levels, which vary

25    by resident based on the "nature and extent of services provided."  Likewise, the

26    Individualized Service Plan prepared for each resident describes the "level of assistance"

27    required from staff to provide the services Sunrise has determined are necessary to meet

28    the resident's needs.  For example, under the category "Bathing," a service plan might list

the following:

> "Needs step-by-step cuing while bathing, Needs standby assistance while bathing. … Be sure bathroom is warmed up prior to shower time, all needed supplies, towels, shampoo, lotions are ready for her. … [O]ffer her privacy but stay stand by [sic] to keep her safe and be sure to cue her for full cleaning.  Give simple step by step instruction if she appears confused on the process and assist as needed."

31.    The Residency Agreement and Individualized Service Plans highlight the obvious—care can only be provided by people/staff, and the reasonable consumer understands that a resident who has additional needs requires additional staff time.  Thus, a reasonable consumer would interpret Sunrise's promise of increased services as residents' needs increase, and the corresponding increase in fees, to include additional staff time to provide those services. The reasonable consumer would not agree to pay increased fees if she knew that Sunrise facilities did not in fact have staff sufficient in numbers and training to deliver services that Sunrise itself determined were necessary and promised to provide.

32.    Sunrise's website and a standardized brochure provided to prospective residents explicitly links staffing levels to the assessed needs of its residents.  A brochure states, "We adjust staffing 365 days a year based on the number of residents and the care they need."  The website lists "Frequently Asked Questions", including "What is your staff to resident ratio?

> A: Our staffing ration is variable and adjusted constantly based on the needs of our residents at each community.  Every resident's Individualized Service Plan (ISP) outlines the type of care they need, which is delivered by a team of Designated Care Managers who also learn each resident's likes, dislikes and preferences, helping to anticipate a resident's needs before they arise.  Our residents and their care managers build very strong bonds."

The website further provides, "Team members are available 24-hours a day for help with bathing, dressing, medication reminders, or other daily activities, relieving residents of the stress of day-to-day chores and giving them more time to focus on choosing activities to participate in, meal selection, and more."

33.    In another standardized brochure entitled, "Senior Living: A Resource Guide," that is provided to prospective residents, Sunrise lists "important questions" that prospective residents should ask "when researching and visiting senior living communities."  The list of questions includes, "How does the community meet residents' needs as they change over time?  Is staffing

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

1   adjusted to ensure that quality of care remains consistent through such changes?"

2        34.    The reasonable consumer expects from all of Defendant's representations that

3   Sunrise will ensure adequate staffing levels to provide the services identified through its resident

4   assessment system.  Sunrise's clear message to the consuming public, including Plaintiff and the

5   putative class, through all of its corporate materials is that staffing levels matter and are part of the

6   value they will receive in exchange for their fees at Sunrise facilities.

7        35.    Because these representations are presented through form contracts and other

8   standardized corporate materials, potential and current residents of Sunrise facilities reasonably

9   expect that they are the policies and procedures followed by Sunrise both for determining the needs

10  of facility residents and for setting staffing levels at each of its California facilities.

11       36.    Based on these representations, Plaintiffs, the putative class members and the

12  general consuming public reasonably expect that Sunrise uses its resident assessment system to

13  ensure adequate staffing and meet all current residents' needs.

14       **Sunrise's Non-Disclosure**

15       37.    Contrary to the express and implied representations in the Sunrise standardized

16  contract and other uniform written statements, Sunrise facilities are not sufficiently staffed to meet

17  the aggregate assessed needs of all facility residents. Sunrise does not disclose this material fact

18  from the residents, their family members, and the general public.

19       38.    Plaintiffs are informed and believe, and on that basis allege, that Sunrise has the

20  capability to determine the facility staffing levels required to meet the aggregate care scores

21  promised to residents.  With its resident assessment system, Sunrise can calculate the amount and

22  type of staff needed by a facility for the population or group of residents therein viewed as a whole

23  on any given shift based on the evaluated needs and assessed scores of residents.  However, while

24  Defendant uses this resident assessment system to assign Service Levels and charge the

25  corresponding daily rates, as a matter of corporate policy and practice, Sunrise has failed to ensure

26  sufficient staffing is provided to meet assessed resident needs.  For example, in job descriptions for

27  Executive Directors of its facilities, Sunrise instructs that meeting labor budgets and operating

28  income targets is a paramount concern, stating among other things, that EDs should "meet[]

financial targets with the goal to maximize the owners return." On information and belief, these and other corporate directives discourage facilities from providing compensation and benefits sufficient to attract and retain sufficient numbers of qualified staff.

39.     As a result of Sunrise's failure to ensure that is facilities are staffed to meet residents' assessed needs, staffing is substantially lower than what Sunrise itself has determined is necessary. As a further result, the residents of Sunrise's facilities run the continuing risk of not having their care needs met and of suffering injury from the lack of care or from other residents who are insufficiently supervised or cared for.

40.     The consequences of Sunrise's common policy and standard corporate procedure of allowing facilities to operate with insufficient staffing levels are significant. They include, but are not limited to: resident falls, injured or sick residents left unattended, elopements, urinary tract infections, slow or no responses to resident call buttons, inconsistent incontinence care resulting in residents sitting in soiled and/or wet briefs for long periods of time, failures to assist with toileting resulting in incontinence, decubitus ulcers, medication errors, and inadequate grooming and hygiene assistance.

**The Misrepresented and Non-Disclosed Facts Are Material**

41.     Defendant's misrepresentations and the facts it does not disclose are material to the reasonable consumer. An important and significant factor in choosing to move oneself or one's relative to a Sunrise facility is the provision of staffing that the facility itself has determined is necessary to meet the assessed needs of all facility residents.

42.     Sunrise's promise to provide the care services (through facility staff) that each resident requires as calculated by the resident assessments conducted by Sunrise is material to prospective residents and their family members. Further, residents (and their family members) reasonably expect that Sunrise will provide staffing at levels sufficient to meet the assessed needs of facility residents. Staffing at levels sufficient to provide the care necessary to meet assessed resident needs is a substantial factor (and indeed often the most important factor) in deciding to enter an assisted living facility. Plaintiffs would not have admitted their family members to Sunrise if they had known that Sunrise facilities are not staffed to meet residents' assessed needs.

Likewise, members of the putative class would in all reasonable probability not have entered Sunrise's facilities if they had known that Sunrise does not have systems in place to ensure sufficient numbers of appropriately trained staff are available at its facilities.

43.    This is true even for residents who currently are practically independent.  These residents choose an assisted living facility as opposed to remaining at home or moving into an independent living community because they wish to "age in place."  Sunrise specifically markets to those individuals on its website by stating it "encourag[es] to age in place." https://www.sunriseseniorliving.com/care-and-services/memory-care/sunrise-reminiscence-program/terrace-club.aspx (last visited on February 22, 2018).  Residents who wish to "age in place" may not need significant assistance with their activities of daily living initially upon admission, but they expect to (and will) become more dependent as they age and do not want to move yet again when that happens.

44.    A key factor for these residents in selecting Sunrise is that the facility will provide the staffing sufficient to provide the care services that Sunrise itself has determined are necessary to meet assessed residents' needs, both now and as those needs, and corresponding care services fees, increase.

45.    Sunrise has a duty to disclose to the consuming public that its facilities are not staffed to meet the assessed needs of residents because of, among other things, the inherent and substantial safety risk to current and future residents from Sunrise's conduct, particularly as Defendant serves a vulnerable population that needs assistance.  The non-disclosure is material because Sunrise knows that its conduct risks the safety of its residents.  Yet, Sunrise has failed to disclose to residents, prospective residents and their family members the true facts about how it sets staffing at its facilities.

**Barriers to Moving Out**

46.    Defendant's misrepresentations affect not only the decision of residents to enter a Sunrise facility, but also the decision to stay there.

47.    In choosing assisted living in general and a Sunrise facility in particular, the resident forgoes other options such as his or her former home, a senior community, or other facilities where

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

the resident can try to build a new community.  Once in a facility, there are significant physical, emotional and other burdens for the residents that are triggered if they terminate residency, including impacts such as "transfer trauma."  Sunrise is aware of these burdens, and makes the representations described herein with the knowledge that it will be difficult for residents to leave its facilities once they are enticed to enter based on its misrepresentations.

48.     Sunrise also repeats its misrepresentations when it conducts periodic re-assessments of residents.  Often, the facility discovers additional care services needed by the resident that Sunrise uses as a basis for a Service Fee increase.

49.     Sunrise thereby unjustly continues to profit from the original fraud by perpetuating its misrepresentations and failures to disclose.

### Named Plaintiffs' Experiences At Sunrise Facilities

### Carlos Heredia

50.     Carlos Heredia ("Mr. Heredia") lived at Sunrise at Tustin in Santa Ana, California from June 18, 2014 to April 18, 2015.  He had dementia, among other medical conditions, when he moved to Sunrise at Tustin.  He died on March 16, 2016.  Plaintiff Audrey Heredia ("Mrs. Heredia") is his surviving wife.  Their daughter, Vivian Heredia ("Vivian"), helped make health care decisions for Mr. Heredia.  Three weeks before he moved into Sunrise at Tustin, Mr. Heredia moved from his home into another assisted living facility that was not part of the Sunrise chain. During those three weeks, he fell twice.  Vivian believed that he fell because there were not enough staff to help him and that he needed to move immediately to another facility that was better staffed. They visited Sunrise at Tustin and spoke to the Executive Director.  Mrs. Heredia and Vivian were rushed and desperate to move Mr. Heredia because he was falling and declining rapidly at the other facility.  The Executive Director assured the Heredias that Sunrise at Tustin was staffed appropriately, they would provide Mr. Heredia with individualized care, and his needs would be met.

51.     In addition, Sunrise provided Mrs. Heredia and Vivian with the standard contract quoted in detail, *supra,* in paragraphs 26-30.  In short, the contract promised that staff would provide an assessment of Mr. Heredia that would be used to develop a service plan and identify his

specific needs.   It promised to provide the services outlined in the service plan.  It also stated that the assessment would be used to identify Mr. Heredia's service level, and that "[t]he rate charged will vary according to the level of service provided."  It explained that a change of level is an increase in services "which are subject to the higher fees corresponding to those services."  Exhibit 1 of the contract provided that Mr. Heredia's service level was "Enhanced Care" and that he would be charged $77 a day for this level of care, in addition to "Base Fees," "Medication Management" fees, and "Pendant" fees, for a total of $236 a day.

52.    Mrs. Heredia and Vivian reviewed the contract and reasonably understood and expected its representations regarding the assessment, service level, service plan, and fee structure to mean that staff would assess Mr. Heredia, identify his needs, and provide the services necessary to meet his needs.  They further reasonably understood and expected that as Mr. Heredia's needs and services increased, he would require more staff time, and that Sunrise would provide the increased staff time in exchange for more fees.

53.    At the time, Mrs. Heredia was under the mistaken belief that Mr. Heredia had appointed her as attorney-in-fact to make healthcare decisions on his behalf.  The Executive Director asked Mrs. Heredia to sign the admission contract without requiring Mrs. Heredia to provide any power of attorney documents.  She signed the contract and consented to arbitration even though Mr. Heredia had not granted her the authority, and did not have the mental capacity at the time, to do so.  Mr. Heredia entered the Tustin facility on June 18, 2014.  Mrs. Heredia and Vivian would not have agreed to admit Mr. Heredia, and pay a Move-In Fee of $4,050 from Mr. Heredia's funds, if Sunrise had disclosed that the facility was not staffed to meet residents' assessed needs.

54.    Approximately six weeks later, the Heredias began noticing problems related to understaffing.  Vivian asked staff if they could occasionally take her father to the courtyard for some fresh air, but they refused stating there was not enough staff available to perform that service. Vivian was disturbed when she heard another resident yelling for help over and over for approximately 15 to 20 minutes.  At the end of July 2014, Mr. Heredia fell, and received stitches in his face, after staff did not respond to his call-pendant and he was forced to transfer alone from his

bed to his wheelchair.  In October 2014, Vivian noticed that staff was not taking Mr. Heredia's blood pressure as frequently as Sunrise had represented they would do and as ordered by Mr. Heredia' physician; Vivian eventually had to hire an outside provider to deliver this service.   Mr. Heredia often complained to Vivian that staff was not responding when he called them for help getting to the toilet, which made him so uncomfortable that his physical therapist recommended that he keep a trash can next to his bed for urinating.  Vivian also personally observed that staff did not always respond to his call-pendant, on one occasion for up to two hours, requiring Vivian to leave the room and find staff herself.  Mr. Heredia fell approximately six times or more because he tried ambulating unassisted when staff did not timely respond to his calls.

55.     In January 2015, Sunrise sent Mrs. Heredia a "Service & Health Update" that gave Mr. Heredia a total of 12 Service Points, and placed him in the "Assisted Living Enhanced" level of care.

56.     On February 19, 2015, Sunrise increased Mr. Heredia's service points from 12 to 15 and his service fees from $77 a day to $99.  A Service Health Update dated April 5, 2015 delineating the 15 points showed that Sunrise had doubled his service points from 1 to 2 points each for mobility, grooming, and assistance to the bathroom because he required "significantly more time" for each task.  Despite the increase in points and related fees, Mr. Heredia did not receive increased attention from staff.

57.     Whenever Vivian approached management and other staff members because her father was not receiving the care for which he was being charged, they would reassure Vivian that her concerns would be addressed and her father's needs would be met.  Sunrise never disclosed to the Heredias that its Service Level system was not supported by sufficient numbers of staff.

58.     In April 2015, Mr. Heredia nearly died from a medication error, which often occurs at facilities that are understaffed.  He suffered from an overdose after he received prescription opiates that were not prescribed to him.  Vivian moved her father out of Sunrise immediately after the overdose.

///

///

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

**Edith Zack**

59.     Edith Zack ("Ms. Zack") had dementia and lived at Sunrise of San Mateo from approximately September 29, 2016 until November 2, 2016.  She died on February 9, 2017, in another facility.  Her daughter, Amy Fearn ("Ms. Fearn") was appointed as Ms. Zack's attorney-in-fact in an advanced health care directive, and made healthcare decisions for her mother.

60.     In April 2016, Ms. Zack toured and considered moving into Sunrise of Belmont. She paid Sunrise a Move-In Fee of $5,000.  However, Ms. Zack decided that she was not ready to enter an assisted living facility at that time and did not move in.  Sunrise refunded only $2,500 of her Move-In Fee even though under the terms of the admission contract it should have refunded Ms. Zack $3,600.

61.     In September 2016, Ms. Zack's dementia was progressing and she was hospitalized while Ms. Fearn was on vacation.  When Ms. Fearn returned from her vacation, she needed to quickly find a dementia care unit for her mother to live upon discharge from the hospital.  Ms. Zack's first choice was Sunrise of Belmont, but there were no beds available.  Ms. Fearn toured Sunrise of San Mateo and reviewed its marketing materials.  She chose Sunrise of San Mateo because the marketing staff represented that all of Ms. Zack's needs would be met.  Ms. Zack moved into the facility on or around September 29, 2016.  She did not pay Sunrise a Move-In Fee a second time.

62.     Prior to Ms. Zack's move into Sunrise of San Mateo, the Executive Director of the facility provided Ms. Fearn with the standard contract quoted in detail, *supra,* in paragraphs 26-30.  In short, the contract promised that staff would provide an assessment of Ms. Zack that would be used to develop a service plan and identify her specific needs.  The contract included Sunrise's promise to provide the services outlined in the service plan.  The contract also stated that the assessment would be used to identify Ms. Zack's service level, and that "[t]he rate charged will vary according to the level of service provided."  It explained that a change of level is an increase in services "which are subject to the higher fees corresponding to those services."  Exhibit 1 to the contract provided that Ms. Zack would be charged a Base Fee of $212 a day for a "Reminiscence Suite," $101 a day for the "Reminiscence Plus Plus" Service Level Fees, and $23 a day for Level 2

1    Medication Management, for a Total Daily Fee of $336.

2        63.    Ms. Fearn reviewed the contract and reasonably understood and expected its

3    representations regarding the assessment, service level, service plan, and fee structure to mean that

4    staff would assess her mother, identify her needs, and provide the services necessary to meet her

5    needs.  She further reasonably understood and expected that as Ms. Zack's needs and services

6    increased, she would require more staff time, and that Sunrise would provide the increased staff

7    time in exchange for more fees.  Ms. Fearn signed the contract, but declined to consent to

8    arbitration.  She relied on all of Sunrise's representations in making the final decision to admit Ms.

9    Zack into Sunrise of San Mateo, but she would not have made this decision if Sunrise had disclosed

10   that it fails to take necessary steps to ensure that its facilities are  staffed at the levels Sunrise itself

11   determines are necessary to meet residents' assessed needs.

12       64.    Ms. Zack discovered not long after her mother moved into the facility that there was

13   not enough staff to provide all of the services that Sunrise promised to provide.  Ms. Zack's

14   Individualized Service Plan stated that she should be escorted "to/from the bathroom for toileting."

15   But Ms. Zack repeatedly called her daughter distressed and embarrassed because she had soiled

16   herself and needed help to change.  Each time this happened, Ms. Fearn called staff and urged them

17   to help Ms. Zack with toileting and to investigate why she was soiling herself.  These calls were

18   frustrating for Ms. Fearn because she had to speak with different staff each time, it did not seem

19   that staff was communicating with each other, and although they reassured her the problem would

20   be addressed, it was not.  Ms. Zack was seldom showering because she required help from staff,

21   and she complained it was too uncomfortable because staff was rushed and rough with her.

22       65.    Ms. Zack's Individualized Service Plan stated that staff should "engage [Ms. Zack]

23   in activities."  But Ms. Zack's cognitive impairments were not as significant as the other residents'

24   in the dementia care unit, and the activities, which did not include painting as Ms. Fearn was led to

25   believe, were not stimulating and failed to "engage" Ms. Zack.  Ms. Fearn asked the Sunrise

26   managers if her mother could join the activities in the assisted living section of the facility, but they

27   refused because there was not enough staff to keep her safe outside of the dementia care unit even

28   for a short period of time.

66.     Ms. Zack's Individualized Service Plan stated that staff should "encourage [Ms. Zack] to eat."  Although Ms. Fearn was at the facility at least several times a week, she did not witness staff perform this service.  Ms. Fearn stocked her mother's refrigerator with groceries that were typically left untouched.  Ms. Fearn also grew frustrated because even though her mother was paying Sunrise $11,000 a month for care and services, she repeatedly fielded her mother's phone calls about problems with the television, remote control, telephone, and other technology, and would have to come to the facility because staff was not available to help.

67.     Ms. Zack required help with ambulation, and staff instructed Ms. Fearn that she should not help her and instead allow staff to help.  Ms. Fearn was concerned because it was often difficult for her, while searching throughout the facility, to find staff to perform this service.  Ms. Fearn never witnessed staff take Ms. Zack's vitals as needed due to her chronic medical conditions, and, on information and belief, staff did not perform this service.  Ms. Zack was becoming more and more unhappy because she felt confined due to minimal opportunities to go outside and the lack of stimulation and engagement.  Although staff always reassured Ms. Fearn that her mother's needs and concerns would be addressed, they were not, and Ms. Zack moved out of the facility on November 2, 2016.

**Elise Ganz**

68.     Helen Ganz ("Ms. Ganz") has resided at Sunrise of San Rafael in San Rafael, California since September 30, 2016.  Elise Ganz ("Elise") is her daughter.  Before Ms. Ganz moved into Sunrise, she lived at Drake Terrace, another assisted living facility in San Rafael, California.  At Drake Terrace, Ms. Ganz suffered an injury from a fall and was sent to a skilled nursing facility for rehabilitation.  Drake Terrace staff informed Elise that her mother could not return to their facility because they could no longer meet her needs and Elise was forced to quickly find another facility for Ms. Ganz.  Elise toured Sunrise of San Rafael and met with the marketing director who assured her that Ms. Ganz would receive the care she needed at Sunrise.

69.     Sunrise provided Elise with the standard contract quoted in detail, *supra,* in paragraphs 26-30.  In short, the contract promised that staff would provide an assessment of Ms. Ganz that would be used to develop a service plan and identify her specific needs.   It promised to

1  provide the services outlined in the service plan.  It also stated that the assessment would be used to

2  identify Ms. Ganz's service level, and that "[t]he rate charged will vary according to the level of

3  service provided."  It explained that a change of level is an increase in services "which are subject

4  to the higher fees corresponding to those services."  Exhibit 1 of the contract provided that Ms.

5  Ganz's service level was "Assisted Living Plus Plus" and that she would be charged $64 a day for

6  this level of care, in addition to "Base Fees" and "Medication Management" fees, for a total of $236

7  a day.

8      70.    Elise reviewed the contract and reasonably understood and expected its

9  representations regarding the assessment, service level, service plan, and fee structure to mean that

10 staff would provide the services they determined Ms. Ganz needed based on a comprehensive

11 assessment.  She further understood and expected that Ms. Ganz would pay more for services as her

12 needs increased, and that there would be enough staff to meet her increasing needs.

13     71.    Elise provided Sunrise with a copy of Ms. Ganz's advanced health care directive that

14 appointed William Ganz and Steven Ganz as her agents for health care decisions.  Nonetheless, the

15 Associate Executive Director, in the rush to admit Ms. Ganz, asked Elise to sign the admission

16 contract, which Ms. Ganz signed, and agreed to arbitration, even though she did not have the

17 authority to do on behalf of Ms. Ganz.  Elise would not have signed the admission contract and

18 agreed to admit Ms. Ganz if Sunrise had disclosed that its facilities were not staffed at levels that

19 Sunrise itself determines are required to meet residents' needs.  Ms. Ganz entered the San Rafael

20 facility on September 30, 2016 and paid a "Move-in Fee" of $5,000.

21     72.    Not long after Ms. Ganz moved into the facility, Elise began noticing problems

22 related to understaffing.  Ms. Ganz was still recovering from her fall at Drake Terrace, and required

23 assistance using her walker to the dining room and other locations in the facility.  Sunrise staff told

24 Elise they did not have time to help Ms. Ganz use her walker, and they discouraged her from using

25 it.  As a result of not using her walker, Ms. Ganz is now dependent on her wheelchair for mobility.

26 Although Sunrise's initial assessment stated that Ms. Ganz required assistance with transferring and

27 that staff should check on her in "frequent intervals" to prevent falls, Ms. Ganz transfers herself

28 from her wheelchair to the toilet because staff does not regularly check on her to see if she needs to

use the toilet.  Staff has found Ms. Ganz on the floor at least four times in recent months.  They gave Ms. Ganz a call-pendant to wear on her wrist, but she does not know how to use it and, on information and belief, staff has not attempted to implement any other interventions to prevent falls.

73.    Ms. Ganz does not always receive showers twice a week, reportedly because she refuses, but Elise is not aware of any interventions by staff to address such refusals, such as, for example, attempting to shower Ms. Ganz at a different time.

74.    There is not enough staff to engage Ms. Ganz in activities with meaningful human interaction and socialization.  Instead, most often the daily "activity" is watching television.  Elise discovered on a few occasions that staff failed to insert her mother's hearing aids, which further isolated her from human interaction.

75.    In September 2017, Elise arrived at the facility at around 11:00 a.m. to find that her mother's bed was not made, had no top sheet, the disposable underpad on the bed was dirty, and there were bits of toilet paper scattered on the floor in Ms. Ganz's room.  Before she arrived at Ms. Ganz's room that morning, Elise stopped to help another resident who was standing in the hallway looking for staff because they had not responded to her call button.  Although Elise complained about the conditions she found in her mother's room that morning, she continues to discover her mother's bed unmade and without sheets.

76.    Elise has complained to managers about problems with her mother's care, and they always reassure her that the problems will be addressed and her mother's needs will be met.  Although most of these problems have not been addressed, Elise is reluctant to move her mother out of Sunrise.  If Ms. Ganz were to move again, it would be her fourth move since her husband died in 2009.  Elise fears yet another move would be too disruptive, disorienting, and possibly even traumatizing for her mother.

## CLASS ALLEGATIONS

77.    The Named Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) as set forth below.

78.    **Class Definition.**  This action is brought on behalf of the Named Plaintiffs and all similarly situated persons who resided or reside at one of the California assisted living facilities

1  owned and/or operated by Sunrise under the Sunrise name from June 27, 2013 through the present

2  (the "Class Period"), and who contracted with Sunrise for services for which Sunrise was paid

3  money.

4          79.     Excluded from the above-referenced class are the officers, directors, and employees

5  of Defendant, and any of Defendant's shareholders or other persons who hold a financial interest in

6  Defendant.  Also excluded is any judge assigned to hear this case (or any spouse or family member

7  of any assigned judge) or any juror selected to hear this case.

8          80.     This action is brought as a class action and may properly be so maintained pursuant

9  to Federal Rule of Civil Procedure 23(b)(3) and applicable case law.  In addition to injunctive relief,

10  this action seeks class wide damages based on Defendant's misrepresentations and misleading

11  statements and material omissions alleged herein.  This action does not seek recovery for personal

12  injuries, emotional distress, or bodily harm that may have been caused by Defendant's conduct

13  alleged herein.

14          81.     **Ascertainability.**  Members of the class are identifiable and ascertainable.

15  Defendant retains admissions contracts, Individualized Service Plans, and billing statements for all

16  persons who currently reside or resided at Sunrise facilities during the class period.  Thus,

17  Defendant's own records will reliably identify class members.

18          82.     **Impracticability of Joinder (Numerosity of the Class).**  Members of the class are

19  so numerous that their individual joinder herein is impracticable.  The precise number of members

20  of the class and their addresses are presently unknown to Plaintiffs.  Defendant currently owns

21  and/or operates approximately 52 assisted living facilities in California.  The precise number of

22  persons in the class and their identities and addresses may be ascertained from Defendant's records.

23          83.     **Questions of Fact and Law Common to the Class**.  Numerous important common

24  questions of law and fact exist as to all members of the class and predominate over the questions

25  affecting only individual members of the class.  These common legal and factual questions include

26  without limitation:

27                  (a)     whether Defendant has violated and continues to violate the Consumer

28  Legal Remedies Act, California Civil Code section 1770 et seq. by promising residents that it will

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

1  provide care and services when Defendant knows that its standard operating procedure and
2  corporate policy of failing to ensure sufficient staffing levels results in residents not receiving the
3  services they need and pay Sunrise to provide, or places them at substantial risk that they will not
4  receive such services.

5          (b)    whether Defendant's misrepresentations, misleading statements and failures
6  to disclose regarding the staffing of its facilities as alleged herein were and are material to the
7  reasonable consumer;

8          (c)    whether a reasonable consumer would be likely to be deceived by
9  Defendant's misrepresentations, misleading statements or failures to disclose;

10          (d)    whether by making the misrepresentations, misleading statements, and
11  failures to disclose alleged in this Complaint, Defendant has violated and continues to violate the
12  Consumer Legal Remedies Act;

13          (e)    whether by making the misrepresentations, misleading statements, and
14  failures to disclose alleged in this Complaint Defendant violated and continues to violate
15  California Business & Professions Code section 17200, et seq. ("UCL");

16          (f)    whether Defendant had exclusive knowledge of material facts not known or
17  reasonably accessible to the Plaintiffs and the class;

18          (g)    whether the Plaintiffs, the class, and the consuming public were likely to be
19  deceived by the foregoing misrepresentations and failures to disclose;

20          (h)    whether the Plaintiffs, the class, and the consuming public have a
21  reasonable expectation that Defendant will ensure staffing sufficient in numbers and training to
22  meet the assessed needs of residents;

23          (i)    whether the Plaintiffs, the Class and the consuming have a reasonable
24  expectation that Defendant will provide staffing at its facilities to meet the aggregate care needs of
25  the residents in its facilities as determined by Defendant's resident assessment system;

26          (j)    whether Defendant's misrepresentations, its misleading statements, and its
27  failures to disclose its true policies, procedures and practices regarding how its staffs its facilities
28  violated the CLRA and the UCL;

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

1          (k)      whether Defendant has engaged and continues to engage in a pattern and

2    practice of unfair and deceptive conduct in connection with the management, administration, and

3    operation of its California assisted living and memory care facilities;

4          (l)      whether Defendant has violated and continues to violate the UCL by

5    violating the CLRA and California W&I Code section 15610.30 during the Class Period;

6          (m)      whether Defendant has committed financial elder abuse under California

7    W&I Code section 15610.30 by taking, secreting, appropriating, obtaining, and/or retaining

8    money from elders and dependent adults for a wrongful use and/or with the intent to defraud them;

9          (n)      whether Plaintiffs and the members of the Class have sustained injury;

10          (o)      whether Plaintiffs and the members of the Class are entitled to damages,

11   and the nature of such damages; and,

12          (p)      whether Plaintiffs and the members of the Class are entitled to restitution,

13   declaratory and injunctive relief and/or other relief, and the nature of such relief.

14          84.      **Typicality.**  The claims of the Named Plaintiffs are typical of the claims of the

15   Class.  As alleged above, Defendant misrepresented to Plaintiffs and the class members and/or their

16   family members that Defendant uses its resident assessment system to determine the care services

17   to be provided by facility staff and to assess and bill residents for corresponding Service Levels.

18   The resident assessment system, and the Service Levels generated by it, allow Defendant to

19   determine and provide the aggregate staffing Defendant has determined is necessary to meet the

20   assessed needs of its residents, but in fact, Defendant's facilities do not have staff sufficient in

21   training and numbers to meet the assessed needs of its residents.  Defendant's staffing policies and

22   practices result in residents not receiving all of the care they have paid for and/or being subjected to

23   the inherent risk that, on any given day, facility staffing will be insufficient to provide the promised

24   care for all residents.  Further, as alleged above, Defendant has failed to disclose material fact from

25   the Named Plaintiffs and the class. Plaintiffs' claims are typical of the claims of the proposed class

26   in the following ways: 1) Plaintiffs are members of the proposed class; 2) Plaintiffs' claims arise

27   from the same uniform corporate policies, procedures, practices, and course of conduct on the part

28   of Defendant; 3) Plaintiffs' claims are based on the same legal and remedial theories as those of the

proposed class and involve similar factual circumstances; 4) the injuries suffered by the Named Plaintiffs are similar to the injuries suffered by the proposed class members; and 5) Plaintiffs seek a common form of relief for themselves and the members of the class.

85.     **Adequacy**.  The Named Plaintiffs are adequate representatives of the class on whose behalf this action is prosecuted.  Their interests do not conflict with the interests of the class.  Also, they have retained competent counsel with extensive experience in class action and senior care litigation and who will prosecute this action vigorously.

86.     **Predominance**.  With respect to Plaintiffs' claims under the CLRA, the UCL, and the Elder Abuse Act, class certification is appropriate because significant questions of law or fact common to class members, including but not limited to those set forth above, predominate over any questions affecting only individual members of the proposed class.

87.     **Superiority**.  A class action is superior to other methods for the fair and efficient adjudication of the controversies raised in this Complaint because:

(a)     individual claims by the class members would be impracticable because the costs of pursuing such claims would far exceed what any individual class member has at stake;

(b)     relatively little individual litigation has been commenced over the controversies alleged in this Complaint and individual class members are unlikely to have an interest in separately prosecuting and controlling individual actions;

(c)     the concentration of litigation of these claims in one forum will achieve efficiency and promote judicial economy;

(d)     the proposed class is manageable, and no difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action;

(e)     the proposed class members are readily identifiable from Defendant's own records; and,

(f)     prosecution of separate actions by individual members of the proposed class would create the risk of inconsistent or varying adjudications with respect to individual members of the proposed class that would establish incompatible standards of conduct for Defendant.

88.     Without a class action, Defendant will likely retain the benefit of its wrongdoing and will continue in its illegal course of conduct which will result in further damages to Plaintiffs and the proposed class.

## FIRST CLAIM FOR VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (Cal. Civil Code § 1750 *et seq.*)

89.     Plaintiffs refer to, and incorporate herein by reference, all preceding paragraphs.

90.     Plaintiffs and the class members are "senior citizens" and/or "disabled persons" as defined in California Civil Code sections 1761(f) and (g).  They are also "consumers" as defined in California Civil Code section 1761(d).

91.     Defendant is a "person" as defined under California Civil Code section 1761(c).  The assisted living and memory care services provided by Defendant constitute "services" under California Civil Code section 1761(b).  The agreement by Plaintiffs and the putative class members to provide new resident services fees and monthly payments to Defendant in exchange for assisted living and memory care services constitute a "transaction" under California Civil Code section 1761(e).

92.     In its uniform resident contracts presented to prospective residents and their family members, Defendant represented and continues to represent that Sunrise will provide care services (through its facility staff) that are sufficient to meet the needs of each resident, as determined by Sunrise's resident assessment system and confirmed in the Service Levels assigned to each resident. That same representation is made in Sunrise's Individualized Service Plans for residents and other standardized corporate materials.  As alleged herein, these uniform corporate representations are false and misleading, and are likely to deceive the reasonable consumer.

93.     Contrary to Sunrise's uniform misrepresentations and misleading statements, Sunrise facilities are not staffed at levels sufficient to provide the services and care that Sunrise itself has determined are necessary to meet residents' needs.  Sunrise does not disclose its staffing policies and practice from current and prospective residents and their family members.

94.     The named Plaintiffs, through their representatives who reviewed the admission contracts on their behalves, and the putative class members considered material Sunrise's promise

to provide care services (through its facility staff) that would be sufficient to meet the needs of each resident, as determined by Sunrise's resident assessment system.  If the named Plaintiffs and their representatives had known the true facts, they would not have agreed to place them in a Sunrise facility.  If the putative class members had known the true facts, they would in all reasonable probability not have agreed to enter Sunrise.

95.     The facts that Sunrise misrepresents, and fails to disclose are material and are likely to deceive the reasonable consumer.  Consumers choose an assisted living facility because they need care and/or wish to age in place as their care needs change.  Residents and their family members consider the overall staffing levels provided by the assisted living facility they select to be of great importance. The use of a system such as the one Sunrise represents it uses, which ensures staffing at the facilities at levels that Sunrise itself has determined are necessary based on  resident assessments, is also, therefore, of great importance to residents and their family members and is a material factor in their decision to choose Sunrise and to pay Sunrise the amounts of money that it charges for occupancy and services.

96.     Residents and their family members would consider material Defendant's uniform corporate policy and practice of failing to ensure adequate staffing levels at its facilities to meet residents' assessed needs.  Plaintiffs and the putative class members could not reasonably have been expected to learn or discover the non-disclosed facts, as alleged herein.

97.     Sunrise has violated and continues to violate the Consumers Legal Remedies Act, California Civil Code section 1750 *et seq.* ("CLRA") in at least the following respects: (a) in violation of section 1770(a)(5), Sunrise has misrepresented, failed to disclose and concealed the true characteristics and/or quantities of services provided at its California facilities; (b) in violation of section 1770(a)(7), Defendant has misrepresented, failed to disclose and concealed the true standard, quality and/or grade of services provided at its California facilities; (c) in violation of section 1770(a)(9), Defendant has falsely advertised that it will provide staffing at sufficient levels to meet assessed resident needs, knowing that it does not intend to provide the services as advertised; and (d) in violation of section 1770(a)(14), Defendant has represented that the agreement signed by residents and/or their representatives, and under which they pay their monthly

1   rate, confers on residents the right to reside in a facility that provides staffing based on the level of

2   care its own resident assessment system has determined is necessary to provide the services each

3   resident needs and for which residents are charged, when in fact, Defendant does not do so.

4       98.     These misrepresentations, misleading statements, acts, practices, and omissions by

5   Defendant are and were intended to induce and lure elderly and dependent adult residents and their

6   family members into agreeing to be admitted to Defendant's facilities and to pay new resident

7   services fees and monthly rates  based on Defendant's resident assessment system and assessed

8   Service Levels.

9       99.     Defendant made the written misrepresentations and misleading statements alleged

10  herein through various uniform means of communication, including without limitation, the

11  admission agreement, service and health updates, individualized service plans, standardized

12  corporate marketing and promotional materials, and other written corporate materials disseminated

13  to the public in connection with Defendant's services.  These representations were made directly to

14  the named Plaintiffs, putative class members and their family members and/or representatives by

15  Sunrise in its standard resident admission contract and reinforced by the uniform means of

16  communication listed above.

17      100.    In addition to its affirmative misrepresentations, Defendant failed to disclose and

18  concealed from Plaintiffs, the putative class members, and their family members that its facilities

19  are not staffed at levels sufficient to meet the assessed care needs of facility residents.

20      101.    Sunrise had exclusive and superior knowledge of material facts not known to the

21  named Plaintiffs, class members, or the general public at the time of the subject transactions and

22  actively concealed these material facts.

23      102.    Sunrise had exclusive and superior knowledge of its corporate policy and practice of

24  allowing its facilities to operate with insufficient staffing levels.  Sunrise knew that its failure to

25  ensure staffing based on the levels of care that Sunrise had itself determined was necessary to

26  provide the services for which it charged its residents posed a substantial health and safety risk to

27  the named Plaintiffs and class members.  Sunrise failed to disclose the true facts with the intent to

28  defraud the named Plaintiffs and putative class members. The named Plaintiffs and the putative

1    class members did not know these material undisclosed facts and could not reasonably have been

2    expected to discover them.

3        103.    As a direct and proximate result of the Defendant's conduct, Plaintiffs and the

4    putative class members suffered actual damages.  Specifically, Plaintiffs and the class members

5    paid money to Defendant, in the form of the new resident fee (called a "Move-In Fee"), their initial

6    monthly fees, and additional monthly fees, paid in exchange for residency and services in a facility

7    that was falsely represented to be staffed based on Sunrise's residential assessment and care level

8    system.  Plaintiffs and the class members paid a premium for the misrepresented services, and

9    would not have entered Sunrise's facilities and made payments to Sunrise had they known the truth

10   about Sunrise's policies and practices for staffing its assisted living facilities.  Members of the class

11   continue to pay monthly fees based on their assessed Service Levels.

12       104.    As a further direct and proximate result of Defendant's conduct, Plaintiffs and the

13   class members have been forced to reside in facilities that have less staff than necessary to satisfy

14   their care needs, as determined by Sunrise itself and/or placed at substantial risk that such will occur

15   at some during their Sunrise residency.  As a result of Sunrise's policies and procedures, there is a

16   substantial likelihood that each resident, at any time, will not receive the care Sunrise has

17   determined necessary and promised to provide.  Plaintiffs and the class members also face the

18   substantial risk that they will suffer physical injuries from such lack of care and/or from other

19   residents who are insufficiently supervised or cared for.

20       105.    Sunrise's conduct presents a continuing threat of substantial harm to the public in

21   that, among other things, Sunrise continues to misrepresent how it uses its resident assessment

22   system and how it determines and provides staffing at its facilities.  Defendant continues to induce

23   elderly and vulnerable citizens to enter its facilities. Additionally, the risk of harm to the class

24   members from Defendant's conduct is substantial.  Accordingly, Plaintiffs seek an injunction that

25   requires that Defendant immediately cease the CLRA violations alleged herein, and to enjoin it

26   from continuing to engage in any such acts or practices in the future.  Additionally, Plaintiffs seek

27   an injunction requiring Defendant to disclose to Plaintiffs, the putative class members, and the

28   consuming public that Sunrise does not ensure that sufficient numbers of trained staff are available

1    at to meet the assessed needs of its current residents.

2        106.    In accordance with Civil Code section 1782(a), Plaintiffs sent Defendant a notice to

3    cure, which was receivd by Defendant on June 5, 2017.  Defendant has not corrected or remedied

4    the violations alleged in the notice and herein.  As authorized under Civil Code section 1782(d),

5    this amended complaint seeks monetary relief under the CLRA.

6        107.    Accordingly, Plaintiffs and the class members are entitled to actual damages in an

7    amount to be proven at trial.

8        108.    Plaintiffs and the proposed class members are also entitled to not less than $1,000 in

9    statutory damages pursuant to Cal. Civ. Code § 1780(a).  Further, Plaintiffs and other class

10   members are also each entitled to statutory damages of up to $5,000 pursuant to Cal. Civ. Code §

11   1780(b).  Plaintiffs and many other class members are seniors and/or disabled persons as defined by

12   Cal. Civ. Code § 1761(f) and (g) and have sustained substantial economic harm as a result of

13   Defendant's conduct.  Defendant knew that its conduct negatively impacted seniors and disabled

14   persons.

15       109.    Plaintiffs additionally seek treble damages under Cal. Civ. Code § 3345, punitive

16   damages, reasonable attorneys' fees and costs, and all other relief the Court deems just and proper.

17   Excluded from Plaintiffs' request are damages related to any personal injuries, emotional distress,

18   or wrongful death suffered by any member of the class.

19
20   <u>SECOND CLAIM FOR UNLAWFUL, UNFAIR AND DECEPTIVE BUSINESS
     PRACTICES (Cal. B&P Code Section 17200 et seq.)</u>

21
22       110.    Plaintiffs refer to, and incorporate herein by this reference, all preceding paragraphs.

23       111.    Defendant has engaged in unlawful business acts and practices.  Such acts and

24   practices constitute unfair business practices in violation of California Business and Professions

25   Code section 17200 *et seq.*

26       112.    In particular, Defendant has engaged in unlawful business acts and practices by

27   violating numerous laws, statutes and regulations including, without limitation:

28           (a)        Systematically and uniformly representing to the residents of its assisted

living facilities in California, family members and the public that Sunrise uses its resident

assessment system and related Service Levels to determine and provide facility staffing, when in

fact, it has not implemented the systems necessary to ensure that sufficient numbers of trained

staff are available to meet residents' assessed needs, in violation of California Business &

Professions Code section 17500, *et seq.* and California Civil Code section 1770, *et seq.*; and

(b)     Taking, secreting, appropriating, obtaining, and retaining the funds of elders

and dependent adults for a wrongful use and/or with the intent to defraud in violation of California

W&I Code section 15610.30.

113.     By virtue of the conduct alleged herein, Defendant has also engaged in fraudulent

business practices. Members of the general public (including without limitation persons admitted to

and/or residing in Sunrise's California assisted living and memory care facilities during the Class

Period, and their family members and/or representatives) have been and are likely to be deceived by

Defendant's misrepresentations and failures to disclose as alleged herein.

114.     The acts and practices of Defendant also constitute unfair business acts and practices

within the meaning of California Business & Professions Code section 17200, *et seq.*, in that the

conduct alleged herein is immoral, unscrupulous, and contrary to public policy, and the detriment

and gravity of that conduct outweighs any benefits attributable to such conduct.

115.     Defendant's misrepresentations, misleading statements, acts, practices, and

omissions were intended to induce and lure elderly and dependent adult residents and their family

members into agreeing to be admitted to Defendant's facilities and to pay a new resident services

fee and monthly rates to live in an assisted living facility that determines and provides staffing

according to the staff time and type of staff Defendant has determined is necessary to provide the

services identified in its resident assessments.

116.     Defendant made these misrepresentations and misleading statements through various

uniform means of written corporate communications, including without limitation, the admission

agreement, service and health updates, individualized service plans, marketing and promotional

materials, Defendant's corporate website, and other materials disseminated to the public from its

corporate headquarters in connection with Defendant's services.  These representations were made

directly to the named Plaintiffs, class members and their family members and/or representatives by Defendant in its standard resident contracts and reinforced by the uniform means of communication listed above.

117.    In addition to its affirmative misrepresentations that Sunrise uses its resident assessment system to determine and provide facility staffing in accordance with residents' assessed needs, Defendant failed to disclose to Plaintiffs, the putative class members, and their family members that Defendant does not ensure that its facilities are sufficiently staffed to provide the services identified as needed in residents' assessments.

118.    Defendant had exclusive and superior knowledge of material facts not known to the named Plaintiffs, putative class members, or the general public at the time of the subject transactions and actively concealed these material facts.

119.    Defendant had exclusive and superior knowledge of its corporate policy and procedure of failing to ensure adequate staffing in its facilities.  Sunrise also knew that its failure to provide staffing based on the levels of care that Sunrise had itself determined as necessary to provide the services for which it charged its residents posed a substantial health and safety risk to the named Plaintiffs and class members.  Sunrise failed to disclose the true facts with the intent to defraud the named Plaintiffs and putative class members. The named Plaintiffs and the putative class members did not know these material undisclosed facts and could not reasonably have been expected to discover them.

120.    As a direct and proximate result of Defendant's conduct, Plaintiffs, the class members, and members of the general public (including without limitation persons admitted to and/or residing in the facilities, and their family members and/or representatives) have been harmed and continue to be harmed.  Among other things, they paid money to Defendant to enter the facility and for services that were substandard to those promised by Defendant.   Accordingly, Plaintiffs and the putative class members are entitled to restitution and other remedies under the UCL statute.

121.    Additionally, Plaintiffs seek an injunction that requires that Defendant immediately cease acts of unlawful, unfair, and fraudulent business acts or practices as alleged herein, and to enjoin Defendant from continuing to engage in any such acts or practices in the future.  Plaintiffs

and the putative class members also seek reasonable attorneys' fees, costs and expenses, and all other remedies permitted by law.

**THIRD CLAIM FOR ELDER FINANCIAL ABUSE (Cal. W&I Code Section 15610.30)**

122.    Plaintiffs refer to, and incorporate herein by this reference, all preceding paragraphs.

123.    Plaintiffs and the putative class members are and at all times were "elders" as defined under California W&I Code section 15610.27 and/or "dependent adults" as defined under California W&I Code section 15610.23.

124.    Defendant entered into a standard agreement with the named Plaintiffs, by and through their power of attorneys, the putative class members and/or their personal representatives. In these agreements, Defendant represented that Sunrise determines and provides staffing at its assisted living facilities sufficient to meet the needs of its residents as determined by Sunrise's assessments and confirmed in Service Levels used to calculate resident charges. Defendant made this promise in exchange for new resident services fees and monthly payments that it received from the named Plaintiffs and the putative class members. Yet Defendant did not and had no intention of complying with its obligations under the contract. Defendant did not intend to and does not ensure that its facilities are staffed at levels sufficient to meet residents' assessed needs. Rather, it has a policy and practice of ignoring and/or failing to address staffing shortages in its facilities. This policy and practice precludes Sunrise from providing facility residents with all of the care Sunrise has promised them and for which they are paying Sunrise.

125.    Defendant knew or should have known that such conduct would likely be harmful to Plaintiffs and the putative class members.

126.    Defendant knew or should have known that Plaintiffs and the putative class members had a right to the funds used to pay new resident move-in fees and monthly fees to Defendant.

127.    As such, Defendant took, secreted, appropriated, obtained, and retained the funds of Plaintiffs and the putative class members for a wrongful use and/or with the intent to defraud.

128.    Defendant's conduct was despicable, fraudulent, reckless, and carried out with a willful and conscious disregard for the rights and safety of Plaintiffs and the members of the putative class.

129.    Accordingly, Plaintiffs and the putative class seek an injunction requiring Defendant to disclose to Plaintiffs, the putative class members and the consuming public that Sunrise does not ensure that sufficient numbers of trained staff are available at to meet the assessed needs of its current residents.

130.    Plaintiffs and the putative class members also seek compensatory damages, reasonable attorneys' fees, costs and expenses, punitive damages, treble damages pursuant to California Civil Code section 3345, and all other remedies permitted by law.  Plaintiffs do not seek certification of any claims for damages related to any personal injuries, emotional distress, or wrongful death suffered by any member of the class.

<b><u>PRAYER</u></b>

WHEREFORE, Plaintiff prays for judgment as follows:

1.    For a Court order certifying that the action may be maintained as a class action;

2.    For statutory damages;

3.    For compensatory damages according to proof, excepting any damages for personal injury, emotional distress, and/or wrongful death suffered by the named Plaintiff or any class member;

4.    For restitution and any other monetary relief permitted by law;

5.    For reasonable attorneys' fees, costs and expenses;

6.    For treble damages pursuant to California Civil Code section 3345;

7.    For punitive damages;

8.    For pre-judgment and post-judgment interest, according to law;

9.    For a public injunction requiring that Defendant immediately cease acts that constitute unlawful, unfair and fraudulent business practices, false advertising and violations of the Consumer Legal Remedies Act, Business and Professions Code section 17200 *et seq.*, and the Elder Financial Abuse statute as alleged herein, and to enjoin Defendant from continuing to engage in any such acts or practices in the future;

10.    Plaintiffs and the class further seek public injunctions requiring Defendant to

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG

1    disclose to the putative class members and the consuming public that Sunrise does

2    not ensure that sufficient numbers of trained staff are available to meet the assessed

3    needs of its current residents and prohibiting Sunrise from charging fees based on

4    resident assessments, when Sunrise does not, as a matter of corporate policy and

5    practice, ensure sufficient staffing levels to meet the assessed needs of its residents;

6    and

7        11.    For such other and further relief as the Court may deem just and proper.

8    **JURY TRIAL DEMANDED**

9    Plaintiffs demand a jury trial on all issues so triable.

10

11    DATED: February 23, 2018        /s/ *Christopher J. Healey*

Christopher J. Healey, State Bar No. 105798

12    **DENTONS US LLP**

4655 Executive Drive, Suite 700

13    San Diego, CA  92121

Tel: (619) 236-1414

14    Fax: (619) 232-8311

15    Kathryn A. Stebner, State Bar No. 121088

George Kawamoto, State Bar No. 280358

16    **STEBNER AND ASSOCIATES**

870 Market Street, Suite 1212

17    San Francisco, CA  94102

Tel:    (415) 362-9800

18    Fax:    (415) 362-9801

19    Robert S. Arns, State Bar No. 65071

**THE ARNS LAW FIRM**

20    515 Folsom Street, 3rd Floor

San Francisco, CA 94105

21

22    Guy B. Wallace, State Bar No. 176151

**SCHNEIDER WALLACE**

23    **COTTRELL KONECKY**

**WOTKYNS, LLP**

24    2000 Powell Street, Suite 1400

Emeryville, California 94608

25    Tel: (415) 421-7100

Fax: (415) 421-7105

26

27

28

Michael D. Thamer, State Bar No. 101440
**LAW OFFICES OF MICHAEL D. THAMER**
12444 South Highway 3
Post Office Box 1568
Callahan, California 96014-1568

W. Timothy Needham, State Bar No. 96542
**JANSSEN MALLOY LLP**
730 Fifth Street
Eureka, CA  95501

Attorneys for Plaintiffs and the Proposed Class

FIRST AMENDED CLASS ACTION COMPLAINT
CASE NO. 4:18-CV-00616-HSG